United States District Court
District of Connecticut
FILED AT NEW HAVEN

11/4 ,20 24

By N. Langello
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE SEARCH WARRANT APPLICATION | Case No. 3:24MJ984 (RMS) |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANT**

I, Daniel C. Veale, currently assigned as a Supervisory Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (203) 508-4093, ("the SUBJECT PHONE"), that is stored at premises controlled by AT&T, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach FL, 33408. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I am a Supervisory Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since June of 2014. I have been assigned to the FBI's New Haven, Connecticut Field Office, and, more specifically, to the New Haven Safe Streets Gang Task Force ("SSGTF" or "Task Force"). As an FBI Supervisory Special Agent, I have

1

directed, conducted, and participated in many criminal investigations of various federal laws, including bank robberies, commercial robberies, kidnappings, narcotics investigations, and drug related homicides. In the course of these investigations, I have worked together with state and local law enforcement agencies to arrest the individuals responsible for criminal offenses. I have written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in federal offenses. I have prepared numerous affidavits in support of applications for search and arrest warrants which have resulted in orders being issued by judges.

3. The information contained in this affidavit is based on my personal participation in the investigation, and information received from other law enforcement officers. I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit. The statements contained in this affidavit are based on: (1) my personal participation in the investigation; (2) information provided to me by Special Agents and Task Force Officers of the FBI and members of the Waterbury, Connecticut Police Department; and (3) my experience and training. This affidavit is intended to show merely that there is sufficient probable cause for the issuance of a search warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 2119 (carjacking), Title 18, United States Code Section 2261A (stalking), and Title 18, United States Code, Section 371 (conspiracy), have been committed by the subjects of the investigation (the "Target Offenses"), and that the proposed search warrant will produce evidence of the Target Offenses.

## THE INVESTIGATION

5. This investigation relates to conspiracy to commit carjacking and stalking that occurred from approximately June 17 to June 25, 2023. On June 18, 2023, a group of

coconspirators misidentified Victim 1 as the culprit in the theft of two all-terrain vehicles that occurred at approximately 2 AM that morning. Shortly after 11 PM that day, Victim 1 and his friend, Victim 2, were threatened at gunpoint, pistol whipped, and Victim 1 was beaten badly before the assailants took a car belonging to Victim 2's grandmother. Leading up to the incident and afterwards, defendant Emily Rodriguez and her coconspirators used Facebook messages and posts to coordinate and plan the confrontation. They also used Facebook, text messages, and phone calls to stalk, harass, and threaten Victim 1 and Victim 2 and their families and partners.

### Rodriguez's Use of the Subject Phone

6. On or about August 14, 2023, Rodriguez arrived at the Waterbury Police Department (WPD) to inquire about the status of an individual that was arrested by WPD. Rodriguez provided the phone number for the SUBJECT PHONE ((203) 508-4093).

7. A review of the subscriber information associated with RODRIGUEZ's Facebook account revealed that telephone number (203) 508-4093 was "Cell Verified." According to Facebook, to confirm a mobile number, a Facebook user must enter a code received by text message into a Confirm box to verify the account via a telephone number.

8. From my training and experience, I have learned that individuals typically always carry their cellular phones on their person so that they can communicate with others. I am aware that ownership and use of cellular telephones in the United States is considered ubiquitous in 2021. According to the Pew Research Center, as of 2020, 97 percent of adult Americans own a cellphone of some kind, and 85 percent own a smartphone. Mobile Fact Sheet, Pew Research Center, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Apr. 29, 2021). The percentage of adults that own any type of cellular telephone is high across all demographics: 100 percent of people aged 18-29, 100 percent of people aged 30-49, 97 percent of people aged 50-

64, and 92 percent of people aged 65+. *Id*. The percentage of adults that own a smartphone is higher among younger demographics: 96 percent of people aged 18-29, 95 percent of people aged 30-49, 83 percent of people aged 50-64, and 61 percent of people aged 65+. *Id*. See also *Carpenter v. United States*, 138 S. Ct. 2206, 22220 (2018) ("[C]ell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)).

9. I also know, based on my training and experience, that individuals, particularly younger individuals in their 30s or younger, such as the suspected ages of the subjects of the captioned investigation, often use social media platforms to describe and/or discuss their criminal activities and that they use their cellphones to make such communications. I also believe that individuals will also leave the area after an incident and use their cellphones to communicate a meet up location with other conspirators to discuss what they have just done.

10. From my training and experience, I also know that cellular service providers track and collect all incoming data using cell towers even though the user of the device is not actively using the device. For data to not be collected, the user would have to make an affirmative action to either turn the phone off or place the phone in airplane mode to stop or prevent any data being collected by the cell towers. Also, while a user could also avoid data collection by not bringing a cell phone into the area covered by the cell tower that services the crime scene, based on my years of experience encountering suspects, and from discussions with other law enforcement officers, I believe that possibility to be highly unlikely as a general matter, and that where a group of individuals is coordinating to commit a crime like carjacking (as here), it is extremely likely that Rodriguez carried a cell phone on her person or near her person at the time of the

carjacking. Further, as set forth below, Rodriguez's use of Facebook on the evening of June 18, 2023, suggests she was using Facebook through the SUBJECT PHONE.

11. Based on my training and experience, I know that accessing Facebook on a cellular telephone requires the use of cellular data networks.

### The ATV Theft

12. On June 18, 2023, at approximately 2:25 AM, two all-terrain vehicles ("ATVs," sometimes referred to as Banshees) were stolen from Emily Rodriguez's[1] house at 75 South Street, Waterbury, CT.

13. Neighborhood surveillance videos recovered from Rodriguez's Facebook page pursuant to a federal search warrant show three hooded, unidentified figures approaching Rodriguez's house. In later surveillance videos, the ATVs are seen being driven away separately, with one of them being followed by someone on foot.

14. Rodriguez's Facebook messages following the theft indicate she was upset.[2] She and a coconspirator, Ricardo Verdejo, began publicizing the theft on their respective Facebook pages. At approximately 10:25 AM on the morning after the theft, Rodriguez posted: "*Wooooooooooo* Let me know if anybody knows anything. They were stolen. They had better

---

[1] On March 21, 2024, Emily Rodriguez was arrested on a criminal complaint arising out of the carjacking incident described in this affidavit. *See United States v. Rodriguez et al.*, Case No. 24-mj-243-RMS. On April 10, 2024, a grand jury returned an indictment charging Rodriguez and two coconspirators, Ricardo Verdejo and Luis Cruz, with conspiracy to commit carjacking and carjacking for their participation in the incident. *See United States v. Rodriguez et al.*, No. 24-cr-76. On August 20, 2024, a grand jury returned a superseding indictment charging the same three defendants with conspiracy to commit carjacking and cyberstalking, as well as substantive counts of carjacking and cyberstalking. Cruz pled guilty on September 10, 2024. On October 15, 2024, a grand jury returned a second superseding indictment charging an additional coconspirator, Michael McCann-Ortiz, with conspiracy to commit carjacking and cyberstalking, carjacking, and stalking. The case is scheduled to be tried in March 2025.

[2] Except as otherwise noted, all of Rodriguez's Facebook messages were in Spanish, and have been preliminarily translated into English.

5

show up because things are going to get juicy, whoever it is." She reported that she was approaching neighbors to get any surveillance footage to try to identify the perpetrators.

15. Over the course of that day, June 18, Rodriguez, Verdejo, and Luis Cruz, aka Goldo, used Facebook to solicit information about the thefts. For example, at approximately 10:51 AM, Cruz shared images of the stolen ATVs and a message: "5k cash if someone tells me where they both at right now!!! Information will stay between us no names nothing just tell me where both bikes are at & you will get payed."

16. At approximately 7:50 PM, Verdejo contacted Michael McCann-Ortiz via Facebook, appearing to follow up on a conversation that had begun in person or through another medium. McCann-Ortiz sent of conversation involving Victim 1. Although Victim 1 made no mention of ATVs or Banshees in the conversation, the coconspirators believed it showed that Victim 1 was involved with the thefts. To date, the FBI has not identified any evidence apart from this screenshot that suggests Victim 1 had any involvement with the ATV thefts. At approximately 7:50 PM—the same time as the events described above—Rodriguez told another Facebook user that "[t]hey are offering it [i.e., the ATVs] to some kid and he told him to say yes."

17. In a written statement to Waterbury Police after the incident, Victim 1 explained that a group of men entered the store where Victim 1 was working and confronted him about stolen bikes. The men threatened him and made him show them his cell phone call log and text messages. At some point during the confrontation, one of the coconspirators took photos of Victim 1, which they then shared widely on Facebook.

18. Rodriguez and her coconspirators coordinated to confront Victim 1 when the store closed at 11:00 PM. At 8:59 PM, Rodriguez sent a message to a Facebook account with the name

Zacarias Piedras del Rio, reporting, "At 10:20, we are going to a bodega that the guy will tell us about." At 9:06 PM, Verdejo sent Rodriguez a picture of Victim 1 at his workplace. Rodriguez then messaged another Facebook user, stating, "we are going to a bodega at 10. . . . If you want, I will tell you so you can show up." She messaged the Piedras del Rio account, stating, "They are talking, the guy said for us to go at 10:20. We will see." At approximately 10:47 PM, Rodriguez reported to another Facebook user, "We have their whereabouts . . . We are here, waiting . . . . There are two cars." Rodriguez messaged two Facebook users with the address of Victim 1's workplace. At approximately 10:56 PM, Rodriguez engaged in a videochat via Facebook with Facebook user Luis Ortiz.

19. Throughout the evening of June 18, 2023, Rodriguez shared her live location with other Facebook users numerous times, including at approximately 9:46 PM, 9:48 PM, 10:41 PM, 10:42 PM, 10:44 PM, 10:46 PM, and 10:49 PM. According to Facebook, users cannot share their live location using a computer, but they can share their live location using an Android device, iPhone, or iPad. As set forth above, RODRIGUEZ's Facebook account was linked to the SUBJECT PHONE, and information obtained through a prior federal search warrant confirmed that RODRIGUEZ was logged into Facebook on her cellular device. Accordingly, I believe that RODRIGUEZ was using the SUBJECT PHONE on the evening of June 18, 2023, to coordinate with several other individuals via Facebook to confront Victim 1.

20. Upon closing the store, Victim 1 was picked up by his friend, Victim 2. Victim 2 was driving his grandmother's car, a 2014 Blue Chevy Equinox. While driving back to Victim 1's home at Pearl Lake Road, Victim 1 and Victim 2 saw three vehicles following them. When Victim 1 and Victim 2 arrived at the Pearl Lake Road apartment complex, the three vehicles blocked them in. Multiple individuals exited the vehicles.

## The Carjacking

21.     According to reports from the Waterbury Police Department, Victim 1 and Victim 2 described the vehicles that followed and blocked them as a newer red Toyota Tacoma with no license plates (Vehicle 1), a gray/silver Honda or Acura four door sedan (Vehicle 2), and a small white KIA SUV or van (Vehicle 3). Victim 1 and Victim 2 observed eight individuals inside of the vehicles who surrounded them and began making claims about the stolen motorcycles/quads.

22.     A Ring.com color video with audio captured the ensuing carjacking beginning at approximately 11:23 p.m. The video was recovered from a resident of the Pearl Lake Road apartment complex. The camera appears to be approximately 10 to 20 feet away from the incident and lasts approximately five and half minutes.

23.     The video, which starts after the confrontation has already begun, shows Victim 1 (wearing a black hoodie and pants and red shoes) and Victim 2 (wearing light colored shorts, a black hoodie, and black sneakers) standing in the parking lot of the apart complex and talking to multiple figures. A shirtless man –whom I believe to be McCann-Ortiz—can be heard threatening Victim 1: "I'm gonna kill you. Imma' kill you." Moments, later, the shirtless man appears to physically attack Victim 2. Shortly thereafter, a figure wearing black shorts, black T-shirt, and a black gaiter covering his hair and nose/mouth carrying an assault-style rifle—whom I believe to be Verdejo—slaps Victim 1 in the back of the head and then hits him in the face with the barrel of the rifle. The hooded figure demands Victim 1 and Victim 2's phones. At the same time, the Equinox can be seen being driven away by another individual.

24.     The individual that I believe to be Verdejo then presses the barrel of what appears to be an assault-style rifle into Victim 1's face, and then into Victim 2's face. Victim 1 and Victim 2 could see the Equinox being driven away, apparently just out of sight of the camera but

still nearby, while the confrontation continued. The assailants asked them where the "bike" was and demanded that Victim 2 tell them the passcode for Victim 2's phone. The video then shows an individual—whom I believe to be Cruz—striking Victim 1 with one of his crutches. The video then stalls. When it resumes, the individual that I believe is McCann-Ortiz is seen running and striking a standing Victim 1. The video stalls again, after which Victim 1 is seen on the ground and Subject 1 is repeatedly striking and kicking Victim 1 in the head while Victim 2 and other assailants watch. During the attack, McCann-Ortiz says: "Where my fucking bike nigga?" Victim 1 is not seen fighting back. Almost immediately thereafter, someone can be heard asking "Where the keys at?" Someone responds: "In my pocket." Victim 2 can be heard saying: "Yo, come on, come on bro. That not even my whip bro. That's my gram's. Please respectfully. Respectfully."

25. Thereafter, the video depicts Victim 2 giving his passcode to the assailants and pleading for the car. Two cars then drive off at a high rate of speed.

**Facebook Communication and Stalking after the Carjacking Incident**

26. Rodriguez continued communicating via Facebook immediately after the carjacking incident. At approximately 11:29 PM, she engaged in a Facebook videochat with Facebook user Luis Ortiz. Approximately four minutes later, Rodriguez sent a voice message to Jose Rodriguez, reporting,

> Well the guy that was with us hit the white boy real hard (giggles) who was acting like a punk, and they took their car as well. So let's see if they show up cause they know what's up because he had texted the guy he fought with that he had two banshee's for sale and when confronted up front he didn't mentioned anything about them. So he's lying it's them.

At approximately 12:12 AM on June 19, 2023—less than an hour after the carjacking—Rodriguez sent a message to Jose Rodriguez stating, "We hid the van." The conversation with Jose Rodriguez continued until approximately 12:19 AM.

9

27. After the carjacking, the coconspirators continued to stalk and harass the Victims and their families and partners, and to discuss the Victims among themselves. For example, one or more coconspirator communicated with Victim 2's mother in the early morning of June 19, shortly after the carjacking, using the phone they had taken from Victim 2. A coconspirator spoke with her via phone all and warned via text message, "I want my property the faster they return it the faster I will give the car and phone back thank you." Victim 2's mother reported that the individual that she spoke to was male, and she heard a female voice speaking Spanish in the background. One or more coconspirator used the phone taken from Victim 2 to harass and threaten Victim 1's girlfriend, warning her in the early morning shortly after the carjacking, "I know we're [sic] you live and work and trust me this will not stop until the problem is solved" before sending a screenshot of the conversation involving Victim 1. The following day, the messages continued: "So wssup what we doing . . . I'm pulling up to your house or your job ? . . . This ain't going to stop until my shit gets found."

28. On the morning of June 20, Rodriguez messaged Victim 1 on Facebook, "The best thing you do is say who has the banchees, we know you know something and sooner or later we're going to find out by hook or by crook, one of you better say the truth because we're not going to rest until we know everything." The same morning, Rodriguez messaged Victim 1's girlfriend on Facebook to demand information about the Banshees. Rodriguez continued to assert that Victim 1 was involved in the theft, including apparent references to the message exchange purportedly showing Victim 1's involvement with the ATV theft. On the evening of June 20, Rodriguez messaged another Facebook user, "We have to go to the store again, every day."

**Information Regarding Cellular Location Data**

29.     In my training and experience, I have learned that AT&T is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

30.     Based on my training and experience, I know that AT&T can collect cell-site data about the SUBJECT PHONE.  I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.  A preservation request was sent to AT&T to retain location information related to the SUBJECT PHONE on or about June 18, 2024.

31.     Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as

11

name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of coconspirators and/or victims.

32. In this case, location information associated with the SUBJECT PHONE will be used to determine whether Rodriguez was present at Victim 1's workplace before the carjacking. Further, because Rodriguez continued to use Facebook shortly after the carjacking and reported, "We hid the van," it is anticipated that cell site information may reveal her path of travel from the time of the carjacking until the stolen Chevy Equinox was driven to the field in Waterbury where it was recovered.

33. Finally, as noted above, the victim's cell phones were stolen in the course of the carjacking and used to communicate with the victim's families and partners. A prior federal search warrant was obtained for cell site information associated with the victim's phones. Accordingly, location information for the SUBJECT PHONE may reveal whether the SUBJECT PHONE was co-located with the victim's phones after the carjacking incident, thereby providing further evidence of the Target Offenses.

## AUTHORIZATION REQUEST

34. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35. I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

DANIEL VEALE
*Digitally signed by DANIEL VEALE
Date: 2024.11.04 13:14:10 -05'00'*

Daniel C. Veale
Supervisory Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me by telephone
on November  4  , 2024, in New Haven, Connecticut.

Robert M. Spector
*Digitally signed by Robert M. Spector
Date: 2024.11.04 14:08:14 -05'00'*

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to records and information associated with the cellular telephone assigned call number (203) 508-4093 that is stored at premises controlled by AT&T (the "Provider") headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach FL, 33408.

**ATTACHMENT B**

**Particular Things to be Seized**

I.   **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **June 17, 2023, through June 19, 2023**:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

  b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

**II. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of Title 18, United States Code, Section 2119 (carjacking), Title 18, United States Code Section 2261A (stalking), and Title 18, United States Code, Section 371 (conspiracy) involving Emily Rodriguez during the period June 17, 2023, through June 19, 2023.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.